ALEXIS WILKINS,

    *Plaintiff,*

v.

VERSANT MEDIA GROUP, INC.
d/b/a MS NOW,

CAROL LEONNIG, and

KEN DILANIAN,

    *Defendants.*

Case No.

**COMPLAINT**

**JURY DEMAND**

1.    This defamation lawsuit is about MS Now (formerly, MSNBC) using sham "anonymous" sources to push knowingly or recklessly false allegations that Alexis Wilkins, through her relationship with FBI Director Kash Patel, abused FBI resources. Defendants are, of course, free to comment on the leadership of the FBI and its allocation of resources, whether positively or negatively. They are not, however, entitled to lie about it. Defendants falsely asserted that Ms. Wilkins demanded, and Director Patel ordered, that federal agents assigned to her security detail—*which did not even exist at the time*—escort an intoxicated friend home after a "night of partying." They falsely portrayed Ms. Wilkins as being intoxicated even knowing that she does not drink. Defendants presumed they could get away with this fiction by citing to "anonymous sources," disingenuously claiming "nonpublic" and "inside" knowledge. This was hogwash and they knew it. Journalists cannot avoid

accountability by hiding behind fabricated "anonymous" sources. This lawsuit seeks to bring accountability for Defendants' egregious lies.

## PARTIES

2.     Plaintiff, Alexis Wilkins, is an individual who is a resident and citizen of the State of Tennessee.

3.     Defendant, Versant Media Group, Inc., d/b/a MS NOW ("Defendant" or "MS Now"), is a Pennsylvania corporation headquartered in New Jersey. Defendant owns and operates the cable news channel and news website, MS Now, formerly known as MSNBC.

4.     Defendant, Carol Leonnig, is an individual who is a resident and citizen of the District of Columbia.

5.     Defendant, Ken Dilanian, is an individual who is a resident and citizen of Maryland.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship, and the amount in controversy exceeds $75,000.

7.     Defendants are subject to personal jurisdiction pursuant to Tennessee Code Ann. § 20-2-214(6) because Ms. Wilkins resides in this District and experienced the results of Defendants' actions therein, and because Defendants directed their lies at this District.

8.     This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) as a substantial amount of events giving rise to this claim occurred within this District.

## FACTUAL BACKGROUND

9.     Ms. Wilkins lives in Nashville, Tennessee and is in a personal relationship with Kash Patel, the Director of the FBI. She is a country singer, author, and political advocate known for her Christian and patriotic values.

10.     On December 5, 2025, Defendant, MS Now, published an article, written by its employees, Defendants Carol Leonnig and Ken Dilanian, titled, "Kash Patel ordered FBI detail to give girlfriend's pal a lift home: sources" (the "Article").[1]

11.     In the Article, Defendants wrote:

FBI Director Kash Patel has — on more than one occasion — ordered that the security detail protecting his girlfriend escort one of her allegedly inebriated friends home after a night of partying in Nashville, according to three people with knowledge of the incidents.

Patel's girlfriend, Alexis Wilkins, asked FBI agents on her security team at least two times, including once this spring, to drive her friend home, and agents objected to diverting from their assignment, said the sources, who were granted anonymity to discuss nonpublic matters. But Patel insisted they do as Wilkins requested and in one case called the leader of Wilkins' security detail and yelled at him to do so.

12.     This is entirely false. Director Patel has never ordered any FBI agent or member of Ms. Wilkins' security detail to escort any of Ms. Wilkins' friends home—inebriated or otherwise—nor did Ms. Wilkins ask any of them to do so. Not only did

---

[1] Carol Leonnig and Ken Dilanian, *Kash Patel ordered FBI detail to give girlfriend's pal a lift home: sources*, MS Now (Dec. 5, 2025), https://www.ms.now/news/kash-patel-girlfriend-fbi-detail-wilkins-ride-home.

3

these supposed demands/orders never take place, but the entire scenario is fabricated. No FBI agents have ever escorted any of Ms. Wilkins' friends home.

13. Defendants claimed in the Article that the substance of their defamatory allegations supposedly occurred in Spring 2025. Notably, Ms. Wilkins did not have a security detail at that time. Defendants were aware of this.

14. Defendants had previously published, on November 17, 2025, an *entire article* about Ms. Wilkins' security detail. Defendants were the first to break that story as Ms. Wilkins had only then been recently assigned a detail, necessary due to credible death threats made against her. Indeed, these death threats by fanatics are fueled by the kinds of lies spread by Defendants.

15. On December 2, 2025—three days prior to publication of the Article at issue in this case—Defendant Dilanian reached out to FBI spokesman, Ben Williamson, to obtain comment on the accusation that Ms. Wilkins' detail had been diverted to escort her friends home. Defendants grossly misrepresented and diminished the FBI's response in the Article, writing:

> FBI spokesperson Ben Williamson did not answer questions about multiple inside accounts of Wilkins' detail being diverted, but broadly denied such events took place.[2]

> "This is made up and did not happen," Williamson said.

---

[2] Since its original publication, Defendants have stealth-edited the Article, without any acknowledgement of the change. In the current online version, the sentence reads: "FBI spokesperson Ben Williamson broadly disputed that such events took place."

16. This was dishonest in two respects. First, Mr. Williamson *did* answer Mr. Dilanian's questions about these unfounded accusations. He did not just "broadly" deny them. He specifically, and pointedly, refuted them *on the record* after having researched the matter by speaking to all potential witnesses, explaining that there is no record or corroboration. Second, it was Dilanian who refused to answer questions. Williamson, who was flabbergasted at Dilanian's complete lack of details or corroboration, asked him for *anything* that would support the accusations. Their text exchange was as follows:

WILLIAMSON: This detail thing you emailed about looks like it's made up. I just checked. No record of it anywhere and Alexis, who doesn't even drink, said it's not true. As did Director. Do you have any more details? General date? Who is the friend? Anything.

DILANIAN: Stand by

WILLIAMSON: Do you not have this info already?

DILANIAN: Just to be clear no one is saying Alexis was drunk. We don't have the details you are looking for but we are comfortable with our sourcing. So just looking for your official comment.

WILLIAMSON: So you have no name, no date range, no nothing – just comfortable with your sourcing. Are you serious?

Respectfully

17. Defendants were, therefore, specifically aware prior to publication that the FBI had investigated the allegations and refuted them. Not only did Defendant Dilanian recklessly disregard this fact, claiming "we are comfortable with our sourcing," but Defendants omitted this information from the Article, falsely implying

that the FBI made only a reflexive and broad denial, and falsely claiming that the FBI had refused to answer questions.

18. Additionally, Defendant Dilanian *lied* to the FBI in the text exchange, falsely claiming that he had no information on the general date of the alleged incident. Had Dilanian provided the Spring timeframe for the allegation, the FBI could, and would have even more conclusively refuted the story by pointing out that Ms. Wilkins had no security detail at that time. Defendants, in calculated fashion, avoided that truth. They knew about the recent assignment of Ms. Wilkins' detail by virtue of their own November 17 article. They knew that if they were to give the FBI the Spring timeframe, it would result in more than just the "official comment" they were looking to get and would derail their desired narrative.

19. Because the alleged events did not take place, all potential witnesses, including every member of Ms. Wilkins' security detail flatly, and rightly, deny the allegations from the Article. And as the FBI has no corroborating records, Defendants' "anonymous" sources could not possibly have had first-hand knowledge. If their sources existed at all, Defendants knowingly or recklessly disregarded their complete lack of knowledge and credibility. Defendants knew this and recklessly chose to publish these anonymously sourced lies in the face of on-the-record refutation.

20. In fact, by saying in the Article that their sources were "granted anonymity to discuss nonpublic matters," and that they were "inside accounts," Defendants falsely suggest to their readers, as intended, that the sources are official,

or even members of Ms. Wilkins' security detail. This alone is evidence of Defendants' maliciously deliberate obfuscation and knowledge of falsity.

21. Consistent with a long-established pattern of hostility against President Trump and those in his orbit, Defendants knowingly published these lies, intending to harm Ms. Wilkins due to their clear animus toward her as an ally and advocate for President Trump and Director Patel.

22. As implicitly acknowledged by Defendant Dilanian, the Article also implies that Ms. Wilkins was inebriated. By claiming that on multiple occasions she was out late after a "night of partying" with a group of inebriated friends in Nashville, Tennessee—a city known for late-night partying and drinking—the Article suggests to the average reader that Ms. Wilkins is a heavy drinker. This is entirely false, as Ms. Wilkins very rarely drinks, if ever. Importantly, Defendants were on actual notice that this implication was false from Mr. Williamson's text message.

23. The Article was intended as a hit piece, as are many other of Defendants' publications, using Ms. Wilkins as a vehicle to attack Director Patel, evidenced by the fact that out of the 1171 words of the Article, roughly half were devoted to rehashing other anonymously sourced—and debunked—criticisms of Director Patel, having nothing to do with these new allegations. For instance, it rehashes criticism of Director Patel's use of a government jet, insidiously comparing him to William Sessions—infamous for misuse of FBI resources—while failing to inform its readers (other than by quoting Director Patel's "insistence") that *federal policy prohibits FBI directors from flying commercial*. It also rehashes the debunked accusation that

Director Patel demanded an FBI windbreaker and SWAT team patch when visiting Salt Lake City.

24.     Defendants even included a quote from a "former FBI agent" and current MS Now contributor, histrionically insinuating that, based on these anonymous (and false) allegations, Director Patel broke his oath of office.

25.     Importantly, the Article deliberately omits key context that Ms. Wilkins has received hundreds of credible death threats, another fact that Defendants knew from their own prior reporting. This is particularly manipulative, as the narrative thrust of the Article is that Ms. Wilkins is the beneficiary of misappropriated taxpayer resources—noting that even *spouses* of former FBI directors received only "episodic" protection, and, even then, "only when they were traveling with their spouse and the director's detail." As Defendants were aware, the FBI assignment of a security detail to Ms. Wilkins was in response to an unprecedented situation: that by virtue of her close relationship with the FBI Director, Ms. Wilkins had received hundreds of death threats after a campaign was launched by social media influencers to falsely accuse her of spying on the FBI on behalf of a foreign government. By omitting any mention of this, Defendants deliberately pushed a false narrative.

26.     As a partisan publication and partisan "journalists," Defendants were motivated to sensationalize, and in this case, fabricate a story to self-promotingly advance their own agenda and notoriety, at the expense of Ms. Wilkins. Defendants published these false allegations not because they believed them to be true, in George Costanza fashion, but because it was an excuse to write a hit piece, advancing a false

narrative that Ms. Wilkins is abusing and wasting FBI resources through her relationship with Director Patel.

27. Virtually every publication by Defendants includes a politically slanted purpose for their readers in dog-whistle fashion. Had they reported the truth, this story would lose its desired effect—there would be no story. They chose not to do so. Such a decision has consequences.

28. Accordingly, Ms. Wilkins brings this suit to hold Defendants accountable for their lies.

<u>CAUSES OF ACTION</u>
<u>COUNT I</u>
(Defamation and Defamation *Per Se* against all Defendants)

29. Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

30. Defendants falsely stated that, "after a night of partying," Director Patel ordered, at Ms. Wilkins' request, FBI agents on Ms. Wilkins's security detail to escort home, on multiple occasions, an intoxicated friend of Ms. Wilkins, with the first instance supposedly occurring in Spring 2025.

31. This is entirely false. Ms. Wilkins neither requested, nor did Director Patel order (much less yell at), any federal agent to escort any of Ms. Wilkins' friends home (intoxicated or otherwise). Ms. Wilkins does not even consume alcohol, and she did not have a security detail in Spring 2025.

32. This lie constitutes defamation *per se* because the defamatory meaning is obvious on its face. Falsely claiming Ms. Wilkins is abusing FBI resources subjects

her to public hatred, contempt, or ridicule, and injures her in her profession. As a country singer, author, and political advocate, known for her Christian, patriotic, America-First, and pro-law enforcement values, her brand and ability to work in her profession would be significantly damaged if her employers, her publishers, her listeners, or her readers, believed that she was abusing the public trust and using her relationship with Director Patel to misappropriate FBI resources.

33. Defendants published these lies knowing they were false or with reckless disregard for the truth. The FBI investigated Defendants' allegation prior to publication and, after searching records and talking with each potential witness, including the members of Ms. Wilkins' security detail, verified that it was false. The FBI made Defendants aware of this prior to publication. While Defendants purport to rely on three anonymous sources, none of those "sources," if they exist, was affiliated with Ms. Wilkins or her security detail, and none of them had any first-hand knowledge of the alleged events. Defendants knew this. Defendants published these lies notwithstanding that knowledge, and in the face of on-the-record refutation from the FBI. Defendants did so because their objective was not to publish the truth—it rarely is—but rather, to publish a hit piece. Defendants' animus toward Ms. Wilkins is readily apparent from the context of the article. Defendants operate with a slanted purpose, do not engage in objective and factually-based journalism, nor is there evidence of adhering to even a semblance of any standard of acceptable journalistic standards. They are driven by partisan desire to undermine the

leadership of the FBI, the administration of President Donald J. Trump, and to self-promote Defendants' notoriety.

34. Defendants made their false statements knowingly, intentionally, willfully, wantonly, and maliciously, with the goal of harming Ms. Wilkins, or in blatant disregard for the substantial likelihood of causing her harm.

35. Defendants' false statements have directly and proximately caused Ms. Wilkins to suffer actual damages to her reputation, standing in the community, and personal humiliation. These damages were foreseeable.

36. As a direct and proximate result of the misconduct of Defendants, Ms. Wilkins is entitled to compensatory, special, and punitive damages, in an amount to be proven at trial.

37. While the facts alleged establish Defendants' actual malice, Ms. Wilkins is not a public figure, and she need only show that Defendants acted negligently, which they self-evidently did. The fact that she is in a relationship with Director Patel does not promote her to the status of public figure or excuse journalists from exercising ordinary care. Neither should false allegations of her benefitting from misappropriated FBI resources.

38. Even if Ms. Wilkins were deemed to be a limited or general public figure, that should also not excuse journalists from exercising ordinary care. Again, the alleged facts establish Defendants' actual knowledge of or reckless disregard for falsity, sufficient to meet the actual malice standard for public figures created by the Supreme Court in *New York Times Co. v. Sullivan* and its progeny. *See* 376 U.S. 254

(1964). This case, however, presents a perfect illustration of how modern "journalists" abuse this outdated and judicially contrived standard to smear so-called public figures. In the face of on-the-record refutation, fabrication of sources (or, at the least, failure of its sources to provide a single corroborating detail), deliberate avoidance of the truth, and inherent implausibility of the story given Ms. Wilkins' lack of a security detail in the Spring of 2025, Defendants blithely assert that they are "comfortable with [their] sourcing." This utter lack of journalistic integrity, much less curiosity, is a symptom of the cancer that has destroyed the credibility of vast swaths of American media. This disease is inextricably linked to the creation of the actual malice standard in 1964, which should be revisited, if not discarded entirely.

39.     It is noteworthy, not only in this case but on a national scale, that this disease has rotted the core of what was once considered our Fourth Estate, in a destructive feedback loop. It is axiomatic that news outlets thrive on sensational stories. This is nothing new. The near immunity they receive from *Sullivan*, however, removes any incentive to check or moderate their reporting on public figures (and the ever-expanding universe of those deemed "limited purpose public figures"), → leading to increasingly sensationalized and irresponsible reports, → leading to polarization in the audience between those who believe the reports (either out of residual trust for the institution or confirmation bias) and those who don't, → leading to polarization of news outlets, who cater reporting to the biases of their target audience, → leading to more irresponsible reporting and further polarization and divide of the public, →

*and so on.* This cycle must end for public trust in the media, and with one another, to even begin restoration.

40. The Supreme Court did not implement the actual malice standard to immunize reporters or to give them *carte blanche* to "report" as a matter of fact any gossip or rumor they are told by imaginary or rubbish "sources" who are "familiar with the matter." Even under the wide latitude afforded to journalists under the judicially created standard of actual malice, journalists should be required to vet their sources, presuming they exist, and should do so using objectively reasonable standards. They should not be able to hide maliciously or recklessly false reporting behind the veil of uncritically accepted, anonymous, or in this case, sham sourcing. In cases like this, where there is a reasonable basis to believe that a reporter used sham sources—even against public figures—there must be accountability.

## COUNT II
### (False Light Invasion of Privacy against all Defendants)

41. Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

42. Defendants falsely implied by the framing of their Article that Ms. Wilkins was inebriated and is a heavy drinker, who regularly parties late at night in Nashville, Tennessee. While the Article never explicitly states that Ms. Wilkins was intoxicated, that is precisely the impression Defendants constructed and conveyed, and reasonable readers of MS Now would come to that conclusion. By doing so, they

portrayed Ms. Wilkins in a false light to the readership of MS Now, which is hundreds of thousands, if not millions, of people.

43. Defendant Dilanian even felt the need to tell the FBI spokesperson that "[j]ust to be clear no one is saying Alexis was drunk," and yet did not feel the need to clarify that point to the MS Now readership. Defendants recognized that their framing carried the implication of Ms. Wilkins being intoxicated and included it anyway.

44. This portrayal was false, as was known by Defendants. They were on actual notice that not only was the entire scenario fabricated, but that Ms. Wilkins "doesn't even drink."

45. This false portrayal is highly offensive to Ms. Wilkins, and would be to any reasonable person in her situation. Ms. Wilkins' professional identity is of a responsible, sober young woman who does not partake in the excess drinking culture and party scene that is typical for musicians.

46. Defendants made this false portrayal knowingly, intentionally, willfully, wantonly, and maliciously, with the goal of harming Ms. Wilkins, or in blatant disregard for the substantial likelihood of causing her harm.

47. Defendants' false portrayal has directly and proximately caused Ms. Wilkins to suffer humiliation and actual damages to her professional identity, reputation, and standing in the community. These damages were foreseeable.

48. As a direct and proximate result of the misconduct of Defendants, Ms. Wilkins is entitled to compensatory, special, and punitive damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alexis Wilkins respectfully requests this Court enter Judgment in her favor and grant relief against Defendants as follows:

a. An award of compensatory, special, and punitive damages in excess of seventy-five thousand dollars ($75,000.00); and

b. Such other and further relief as the Court deems just and appropriate to protect Plaintiff's rights and interests.

## Demand for Jury Trial

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 29, 2026

*By Counsel*

Respectfully submitted,

/s/ Kurt V. Beasley

Kurt V. Beasley
WATERFORD LAW GROUP, PLLC
P.O. Box 1089
Franklin, Tennessee 37065
Phone: (615) 373-2500
kbeasley@waterfordlaw.com

Jason C. Greaves, *PHV forthcoming*
Jared R. Roberts, *PHV forthcoming*
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930

15

jason@binnall.com
jared@binnall.com

*Counsel for Plaintiff Alexis Wilkins*