**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

|  |  |
|---|---|
| ALEXIS WILKINS, | : |
| Plaintiff, | : Civil Action No.: 3:26-cv-00725 |
| v. | : District Judge Eli J. Richardson |
|  | : Magistrate Judge Luke A. Evans |
| VERSANT MEDIA GROUP, INC. d/b/a MS NOW, CAROL LEONNIG, and KEN DILANIAN, | : JURY DEMAND |
| Defendants. | : |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS OR TO TRANSFER

BALLARD SPAHR LLP

Michael Berry (*pro hac vice*)
Jacquelyn N. Schell (*pro hac vice*)
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
berrym@ballardspahr.com
schellj@ballardspahr.com

BRADLEY ARANT BOULT CUMMINGS LLP

Ty E. Howard (No. 26132)
Brooke Sgambati
1221 Broadway, Suite 2400
Nashville, TN 37203
(615) 244-2582
thoward@bradley.com
bsgambati@bradley.com

*Counsel for Defendants Versant Media Group, Inc.,*
*Carol Leonnig, and Ken Dilanian*

<u>**INTRODUCTION**</u>

This defamation and false light invasion of privacy lawsuit arises from an article published online by MS NOW about FBI Director Kash Patel ("Article"). The Article details concerns raised by current and former FBI agents about Patel's job performance, including his use of FBI resources. The Article reports, among other things, that Patel used a government jet to travel to his girlfriend's concert, provided her with a government-issued security detail, and demanded, on at least two occasions, that FBI agents give his girlfriend's friend a ride home.

Patel, however, is not the plaintiff. It is his girlfriend, Alexis Wilkins. She claims that the Article defamed her by falsely accusing her of "abusing FBI resources" and cast her in a false light by implying she "was inebriated and is a heavy drinker who regularly parties late at night." Compl. ¶¶ 32, 42 (Dkt. 1). Neither claim is viable. Both rely on interpretations of the Article that are not reasonable. As to her defamation claim, nothing in the Article suggests Wilkins "abus[ed] the public trust." It simply reports she *asked* FBI agents to drive her friend home so the friend would arrive safely – a statement that would not hold a person up to hatred and ridicule in society. The Article also explicitly states that the FBI denied that request, and it was *Patel* who ordered the FBI to drive the friend. To the extent the Article can be deemed a "hit piece" on Patel, as Wilkins alleges, she cannot state a claim for alleged defamation of her boyfriend. As to her false light claim, the Article does not state or suggest that Wilkins was intoxicated on the nights in question, much less that she is a "heavy drinker." Moreover, any suggestion that an adult chose to drink alcohol with a friend would not be "seriously offensive" to a reasonable person. Wilkins' claims thus fail as a matter of law.

The Court need not reach those issues, however, as it lacks jurisdiction over Defendants Versant Media Group, Inc. ("Versant"), the parent of MS NOW, and the two veteran, D.C.-based

reporters who wrote the Article.  As the Complaint acknowledges, Defendants lack any connection to Tennessee.  The only connection to this forum is Wilkins' claim that she resides here.  That is not enough to confer personal jurisdiction over the Defendants.  They are not "at home" in Tennessee, and they did not direct their actions toward this State.  Rather, they published an article to a national audience discussing concerns raised about the Director of the FBI, a public official whose conduct is a matter of broad public interest around the country.  The Court therefore should dismiss the Complaint for lack of personal jurisdiction or, in the alternative, transfer the case to the District of Columbia, where most of the parties are located and where most of the work on the Article was performed.

**FACTUAL ALLEGATIONS**

## I.  <u>Alexis Wilkins and the Article at Issue.</u>

Wilkins is a "country singer, author, and political advocate."  Compl. ¶ 9.  Professionally, she is "known for her Christian, patriotic, America-First, and pro-law enforcement values."  *Id.* ¶ 32.  She also "is in a personal relationship" with FBI Director Kash Patel.  *Id.* ¶ 9.

Sometime after Patel was appointed, Wilkins was assigned an FBI security detail, which Wilkins claims was "necessary due to credible death threats made against her."  *Id*. ¶ 14.  Wilkins alleges that MS NOW and two of its journalists, Carol Leonnig and Ken Dilanian, "were the first to break" the news about the detail in an article published on November 17, 2025.[1]

---

[1] This article is available online at https://www.ms.now/news/kash-patel-girlfriend-fbi-detail-alexis-wilkins-rcna243999.  While Wilkins splits hairs over the timing of when she was assigned a security detail, contending that the November article proves Defendants "were aware" the detail had been "recently assigned," Compl. ¶¶ 13, 14, the timing is irrelevant for purposes of this Motion.  In any case, the November article does not indicate when Wilkins began receiving government protection.  Other reporting, however, states she had FBI protection by the spring of 2025. *See* Alan Feuer, Adam Goldman & Glen Thrush, *Patel Under Scrutiny for Use of SWAT Teams to Protect Girlfriend*, New York Times (Nov. 23, 2025), https://www.nytimes.com/2025/11/23/us/politics/kash-patel-girlfriend-fbi-protection.html.

2

Nearly three weeks later, on December 5, 2025, MS NOW published another article by Leonnig and Dilanian titled "Kash Patel ordered FBI detail to give girlfriend's pal a lift home: sources: The FBI director's use of resources is under intense scrutiny as he insists he's 'a steward of the taxpayer dollars.'" *See* Compl. ¶¶ 3-5, 10. That article is the basis for this lawsuit and is attached hereto as Exhibit 1 (hereinafter, the "Article").[2]

The Article begins by reporting that "FBI Director Kash Patel has – on more than one occasion – ordered that the security detail protecting his girlfriend escort one of her allegedly inebriated friends home after a night of partying in Nashville." Ex. 1 at 1. The Article reports that, "according to three people with knowledge of the incidents," "Patel's girlfriend, Alexis Wilkins, asked FBI agents on her security team at least two times, including once this spring, to drive her friend home, and agents objected to diverting from their assignment." *Id.* "But," the Article continues, "Patel insisted they do as Wilkins requested and in one case called the leader of Wilkins' security detail and yelled at him to do so." *Id.* While the Article states that the friend was "allegedly inebriated," the Article does not state that Wilkins was inebriated or even with the friend at the time. *Id.*; *see* Compl. ¶ 42 ("the Article never explicitly states that Ms. Wilkins was intoxicated").

---

[2] The Article is also available online at https://www.ms.now/news/kash-patel-girlfriend-fbi-detail-wilkins-ride-home. The Court may consider this Article and the November article because they are incorporated by reference in the Complaint and the Article is the basis for Wilkins' claims. *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 659 (M.D. Tenn. 2018) ("documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim").

3

The Article reports that FBI spokesperson Ben Williamson "broadly disputed that such events took place." Ex. 1 at 2.[3] Specifically, the Article quotes Williamson saying: "This is made up and did not happen." *Id.*

The Article also describes the response of former FBI agents and senior law enforcement officials, who thought it was "already disturbing that Patel had pulled elite tactical agents away from their SWAT mission to drive his girlfriend around town." *Id.* They were "shocked that the director instructed tactical agents to use their time on yet another person the FBI had no reasonable duty to protect." *Id.*

The Article discusses these incidents in the context of growing concerns among FBI agents about Patel's "personal use of bureau resources," including another example of where Patel used a government jet to see Wilkins perform in Pennsylvania. *Id.* at 3. The Article highlights perceived issues with Patel's temperament and overall job performance and catalogues various incidents that gave rise to these concerns. For instance, it describes a report, prepared for congressional judiciary committees, that recounts anonymous complaints from more than 20 former and current FBI law enforcement personnel. *Id.* Those agents described Patel as "lack[ing] the requisite experience" and "self-confidence," citing, for example, an incident where Patel launched an "expletive-laden tirade" at an FBI agent. *Id.* at 2.

## II.    Wilkins' Lawsuit

On May 29, 2026, Wilkins filed this lawsuit against MS NOW's parent, Versant, as well as Leonnig and Dilanian. Wilkins filed suit in the Middle District of Tennessee, where none of the Defendants reside or have offices. *See* Compl. ¶ 3-5.

---

[3] According to the Complaint, the Article, when originally published, stated: "FBI spokesperson Ben Williamson did not answer questions about multiple inside accounts of Wilkins' detail being diverted, but broadly denied such events took place." Compl. ¶ 15.

4

The Complaint alleges the Article is a "vehicle to attack Director Patel." *Id.* ¶ 23; *see also id.* (complaining "roughly half" of the words in the Article are devoted to "criticisms of Patel"). Indeed, many of the Complaint's allegations center on Patel, claiming that the criticism and accusations it reported have been "debunked." *E.g.*, *id.* Yet, it is Wilkins – not Patel – who is the plaintiff. She asserts two claims: (1) defamation and (2) false light invasion of privacy.

The defamation claim is based on Wilkins' contention that she never "requested" that "any federal agent" escort her friend home. *Id.* ¶ 31. She claims that by reporting otherwise, the Article defamed her through the "false narrative" that she is "abusing and wasting FBI resources through her relationship with Director Patel." *Id.* ¶ 26.

Separately, Wilkins claims the Article cast her in a false light because it implies, through its "framing," that she is a "heavy drinker," *id.* ¶ 42, when she "very rarely drinks, if ever," *id.* ¶ 22. Wilkins claims that this purported implication is "highly offensive" because her "professional identity is of a responsible, sober young woman who does not partake in the excess drinking culture and party scene that is typical for musicians." *Id.* ¶ 45.

Defendants now move to dismiss the Complaint.

**<u>ARGUMENT</u>**

The Court should dismiss this case for lack of personal jurisdiction or, in the alternative, transfer the case to the U.S. District Court for the District of Columbia, where most of the Defendants and witnesses are based, and where the reporting occurred. If the Court finds that personal jurisdiction and venue are proper here, it should dismiss the Complaint for failure to state any legally viable claim, as the Article is not capable of any defamatory meaning about Wilkins and because the Article does not cast her in a false light that would be "highly offensive" to a reasonable person.

5

## I. THE COURT SHOULD DISMISS FOR LACK OF PERSONAL JURISDICTION.

To establish personal jurisdiction over a defendant, a plaintiff must allege facts sufficient to show a *prima facie* case that the Court either has general jurisdiction because the defendant is essentially "at home" in Tennessee or has specific jurisdiction because the claims arise out of the defendant's contacts with Tennessee. *See Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014).

Neither basis for jurisdiction exists for any of the Defendants. Versant is incorporated in Pennsylvania, headquartered in New York, and does not maintain any offices in Tennessee. Compl. ¶ 3; Decl. of Jayshree Mahtani ("Versant Decl.") ¶ 2; Fed. R. Civ. P. 7.1(a)(2) Disclosure Statement (Dkt. 22).[4] Both Leonnig and Dilanian live in the District of Columbia, report to Versant's office there, and conducted their reporting, which was published nationally, from the D.C. area. Compl. ¶¶ 4-5; Leonnig Decl. ¶ 3; Dilanian Decl. ¶ 3.[5] Wilkins does not allege that any of the reporting for the Article occurred in Tennessee. She claims that the Defendants are nevertheless subject to personal jurisdiction in this Court because Wilkins "resides in this District and experienced the results of Defendants' actions therein" and because Defendants "directed" the Article at this District. Compl. ¶ 7. That is incorrect.

### A. The Court Lacks General Jurisdiction Over the Defendants.

Wilkins has not alleged that Defendants are subject to general jurisdiction in Tennessee, nor could she. To be subject to general jurisdiction, a defendant must be "essentially at home" in the forum. *Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915, 919 (2011). For a

---

[4] The Complaint alleges that Versant is headquartered in New Jersey, Compl. ¶ 3, but Versant is in fact headquartered in New York. *See* Versant Decl. ¶ 2; Fed. R. Civ. P. 7.1(a)(2) Disclosure Statement (Dkt. 22). In any event, for purposes of this Motion, it is relevant only that Versant's headquarters is outside Tennessee.

[5] Dilanian resided in Maryland, in the D.C. suburbs and metro area, when the Article was published, *see* Compl. ¶ 5, and he now lives in the District of Columbia. *See* Dilanian Decl. ¶ 3.

6

company, the paradigm bases of general jurisdiction are a company's "place of incorporation and principal place of business," and for an individual, it is the "individual's residence." *Daimler*, 571 U.S. at 137. Versant is not incorporated or headquartered in Tennessee. *See* Compl. ¶ 3; *see also* Versant Decl. ¶ 2. Leonnig and Dilanian are both domiciled in states other than Tennessee. *See* Compl. ¶¶ 4-5; Leonnig Decl. ¶ 3; Dilanian Decl. ¶ 3. Thus, the Court does not have general jurisdiction over Defendants.

### B. The Court Lacks Specific Jurisdiction Over Defendants.

Wilkins also has not pleaded facts demonstrating specific jurisdiction based on any alleged "suit-related conduct." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Under Tennessee's long-arm statute, courts may exercise jurisdiction over a nonresident defendant on "any basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-214(a)(6). Thus, the Court "must decide whether the exercise of jurisdiction comports with the limits imposed by federal due process, without having to decide separately whether Tennessee law authorizes the exercise of jurisdiction." *Ever-Seal, Inc. v. DuraSeal, Inc.*, 2022 WL 3599519, at *7 (M.D. Tenn. Aug. 23, 2022) (Richardson, J.); *see also Camps v. Gore Cap., LLC*, 2019 WL 2763902, at *5 (M.D. Tenn. July 2, 2019) ("[T]he jurisdictional limits of Tennessee law and federal constitutional due process are identical, and the two inquiries are merged.").

This analysis "focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 283-84 (cleaned up). There are "[t]wo related aspects of this necessary relationship." *Id.* at 284. "First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* Thus, "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285. "Rather, it is the *defendant's* conduct that must form the necessary connection with the forum State." *Id.* (emphasis added). Second, the

7

Case 3:26-cv-00725    Document 23-1    Filed 08/11/26    Page 8 of 25 PageID #: 80

"'minimum contacts' analysis looks to the defendant's conduct with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 285. Accordingly, the Supreme Court "ha[s] consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating the contacts between the plaintiff (or third parties) and the forum State." *Id.*

Consistent with this precedent, the Sixth Circuit has explained that a court has specific jurisdiction over a defendant only when the defendant "purposefully directed" her conduct at the forum State. *Blessing v. Chandrasekhar*, 988 F.3d 889, 904 (6th Cir. 2021) (quoting *Burger King*, 471 U.S. at 476). When addressing personal jurisdiction in the context of an online publication, like the Article, the focus is not on whether residents of the forum state could access an out-of-state website, but instead whether a communication was "specifically directed at the forum state." *Id.* at 905.

The Sixth Circuit recently examined this requirement in two cases involving Twitter posts about residents of Kentucky and Tennessee. In *Blessing v. Chandrasekhar*, the court considered a defamation lawsuit brought against out-of-state defendants who had tweeted about high school students from Kentucky. 988 F.3d at 892-93. The court held that posting online about Kentucky-based plaintiffs was not sufficient to subject the defendants to a Kentucky court's jurisdiction because the defendants took "no affirmative steps to direct any communications to the plaintiffs or anyone else in Kentucky," instead directing their posts "to their Twitter followers generally." *Id.* at 906. The court noted that sister circuits "have routinely held that 'posting allegedly defamatory comments or information on an internet site does not, without more, subject the poster to personal jurisdiction wherever the posting could be read (and the subject of the posting may reside).'" *Id.* at 905 n.15 (quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1241

8

(10th Cir. 2011)); *see also Revell v. Lidov*, 317 F.3d 467, 475 (5th Cir. 2002) (no personal jurisdiction where online post "was presumably directed at the entire world") (cited in *Blessing*, 988 F.3d at 905 n.16).[6] This reasoning applies even where a publication specifically references the forum state. *See Johnson v. Arden*, 614 F.3d 785, 796-97 (8th Cir. 2010) (cited in *Blessing*, 988 F.3d at 906 n.15) (even though challenged postings referenced forum state, court concluded they were not posted "for the very purpose of having their consequences felt in Missouri" (cleaned up)); *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002) (even though challenged article referenced plaintiff warden's Virginia prison, defendant newspapers did not "manifest an intent to target and focus on Virginia readers") (cited in *Blessing*, 988 F.3d at 905 n.16). Moreover, because Kentucky was not the "focal point" of the tweets, plaintiffs' allegations that they "suffered harm" there were insufficient. *Blessing*, 988 F.3d at 906.

The Sixth Circuit came to a different conclusion two years later, where the defendant "intentionally targeted" Tennessee with her tweets. *Johnson v. Griffin*, 85 F.4th 429, 434 (6th Cir. 2023). Like *Blessing*, the case arose from tweets by an out-of-state defendant about a resident of the forum state. But unlike *Blessing*, the allegations in *Johnson* focused on the

---

[6] Courts in this Circuit have repeatedly found jurisdiction lacking for similar reasons. *See, e.g.*, *Cadle Co. v. Schlichtmann*, 123 F. App'x 675, 679 (6th Cir. 2005) ("nothing on the website specifically targets or is even directed at Ohio readers, as opposed to the residents of other states"); *Twin Flames Universe.com, Inc. v. Cole*, 528 F. Supp. 3d 708, 717 (E.D. Mich. 2021) (defendant "merely made posts on several websites and reposted the Vice Media articles that included her comments about [plaintiff], all of which could be read by anyone"); *Bailey v. Turbine Design, Inc.*, 86 F. Supp. 2d 790, 795 (W.D. Tenn. 2000) ("the allegedly defamatory statements were merely posted on the website to be viewed by whomever cared to do so"); *accord, e.g.*, *Alexander v. Diet Madison Ave.*, 473 F. Supp. 3d 551, 558 (E.D. Va. 2020) (courts have "rejected the argument that nonresident news organizations open themselves up to suit in a state simply by publishing online articles about that state's residents"); *Blankenship v. Napolitano*, 451 F. Supp. 3d 596, 622-23 (S.D. W. Va. 2020) ("It would not be reasonable for [individual defendants] to anticipate being haled into a West Virginia court on the basis of comments in a broadcast about political issues across several states aimed at a national audience.").

numerous ways the defendant targeted that state, beyond merely tweeting about one of its residents. *Id.* For example, the tweets (1) repeatedly emphasized plaintiff's residence in Tennessee; (2) directly communicated with plaintiff's Tennessee-based employer, stressing "the company's home base in Nashville"; (3) pressured that employer to fire plaintiff; and (4) urged her followers to do the same. *Id.* at 433-35; *see also id.* at 434-35 (distinguishing *Blessing* because the tweets were "directly sent to a decisionmaker in a forum" and "intentionally incite[d] third parties against that decisionmaker"). Thus, the defendant "'undoubtedly knew' that the 'focal point' of her tweets concerned Tennessee." *Id.* at 433.

This case is like *Blessing*, and not like *Johnson*. Nothing in Wilkins' Complaint or the Article suggests that Defendants intentionally targeted a Tennessee audience. While Wilkins contends summarily that "Defendants directed their lies at this District," Compl. ¶ 7, she does not allege any facts to support that conclusion. *See Ever-Seal*, 2022 WL 3599519, at *6 (plaintiff "must show the specific facts demonstrating that the court has jurisdiction"). Nor could she. MS NOW is a national news outlet that publishes to a national audience. As the Complaint itself acknowledges, the "readership of MS Now . . . is hundreds of thousands, if not millions, of people." Compl. ¶ 42. The Article's focus is not on Tennessee, either. While it twice references Nashville, including to note that Wilkins lives there "part time," Ex. 1 at 2, the Article's focus is the FBI director, who is based in Washington, D.C. and whose actions occurred primarily in D.C. The Article – of national interest and published to a national audience – was not targeted at Tennessee.

Wilkins also alleges that she felt the alleged harm in Tennessee, *see* Compl. ¶ 7, but that is irrelevant to whether the Court has jurisdiction over Defendants. *See Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but

10

whether the defendant's conduct connects [it] to the forum in a meaningful way."); *see also Moore v. U.S. Ctr. for SafeSport*, 774 F. Supp. 3d 887, 903 (E.D. Mich. 2025) (it is irrelevant that defendants "made the allegedly tortious statements about Michigan residents").

In short, nothing about Defendants or the Article shows that it was expressly targeted at Tennessee, nor has Wilkins alleged as much.  The Court, therefore, should dismiss this case because it lacks jurisdiction over Defendants.

## II.  IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER VENUE TO THE DISTRICT OF COLUMBIA.

In the alternative, Defendants respectfully request that the Court exercise its discretion to transfer this action to the District of Columbia pursuant to 28 U.S.C. § 1404, which allows transfer to another jurisdiction where the action "might have been brought" for "the convenience of parties and witnesses" and "in the interests of justice."  *Sacklow v. Saks Inc.*, 377 F. Supp. 3d 870, 876 (M.D. Tenn. 2019) (courts have "discretion to transfer cases on an individual basis by considering convenience and fairness") (quoting *Kerobo v. Sw. Clean Fuels Corp.*, 285 F.3d 531, 537 (6th Cir. 2022)); *see also Aqeel v. Liberty Ins. Corp.*, 2026 WL 124240, at *4 (M.D. Tenn. Jan. 16, 2026) (Richardson, J.) (courts have "broad discretion in ruling on a motion to transfer"). Here, the Court may transfer the case in lieu of dismissal for lack of personal jurisdiction or without first deciding personal-jurisdiction issues.  *See id.*  Under § 1404, the moving party meets its burden to show that transfer is appropriate where it shows that the other forum is "the more convenient one *vis a vis* the plaintiff's initial choice."  *Drake v. FedEx Ground Package Sys., Inc.*, 2024 WL 942378, at *2 (W.D. Tenn. Mar. 5, 2024).

To determine whether transfer is warranted, courts weigh "case-specific factors," including "(1) the location of willing and unwilling witnesses; (2) the residence of the parties; (3) the location of the sources of proof; (4) the location of the events that gave rise to the dispute;

11

(5) systemic integrity and fairness; and (6) the plaintiff's choice of forum." *Sacklow*, 377 F. Supp. 3d at 877. The balance here "strongly favors the alternative forum." *Id.*

A. <u>**The District of Columbia Is a Proper Venue.**</u>

A civil action may be brought in any judicial district where a defendant resides or where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b). The two reporters who wrote the Article live in the District of Columbia and work in Versant's Washington, D.C. bureau. *See* Compl. ¶¶ 4-5; Leonnig Decl. ¶ 3; Dilanian Decl. ¶ 3. Although Versant is domiciled in Pennsylvania and New York, the reporting and editing of the Article was largely done from its bureau in the District of Columbia. *See* Versant Decl. ¶ 5; Leonnig Decl. ¶ 4; Dilanian Decl. ¶ 4. Thus, Wilkins could have filed suit in the District of Columbia.

B. <u>**Transferring Venue to the District of Columbia Is Warranted.**</u>

The convenience of the witnesses is "perhaps the most important factor in the transfer analysis." *Sacklow*, 377 F. Supp. 3d at 878. Here, the key fact witnesses from MS NOW – including the reporters and their primary editors – report to MS NOW's bureau in the District of Columbia. Versant Decl. ¶ 5. Many of the key non-party witnesses are also based in the District of Columbia. Patel, whose actions are the primary focus of the Article, is the director of the FBI, which is based in Washington D.C. FBI spokesperson Ben Williamson, whose statements Wilkins contends establish the falsity of the reporting, is also presumably based at the FBI's headquarters in Washington, D.C.

For all these witnesses, it would be more convenient to appear for a hearing or trial in the District of Columbia. Relatedly, if any of these witnesses are unwilling or reluctant to appear,

12

they are more likely to be subject to compulsory process (*i.e.*, within a 100-mile radius) if the case is pending in the District of Columbia than in the Middle District of Tennessee.

Given the location of the witnesses, most of the other sources of proof, including any physical documents in the FBI's custody, would likely be located in the District of Columbia as well. *See* Compl. ¶ 19 (claiming that "the FBI has no corroborating records"). In addition, Wilkins' Complaint makes much of the Defendants' reliance on confidential sources for the Article, *see, e.g.*, *id*. ¶ 33, and, to the extent the litigation implicates those sources as the case proceeds, Defendants expect to invoke the protections of the District of Columbia's reporter's privilege. While this Court could no doubt apply that law, the District of Columbia is likely to have a strong interest in these issues. *See Sacklow*, 377 F. Supp. 3d at 877 (transfer factors include "local interest in deciding local controversy at home" and "the familiarity of the trial judge with the applicable state law").

Finally, while Wilkins alleges that she is a Tennessee resident, Compl. ¶ 2, she also has significant ties to the District of Columbia, including through her "personal relationship with Patel," her travel as a musician, and her role as a "political advocate." *Id*. ¶ 9.[7] According to her LinkedIn, Wilkins was a press secretary for a member of Congress through May 2025, and, until July 2026, she was as a senior fellow at the American Principles Project, which is based in Washington, D.C. *See* Ex. 2.[8] She is also pursuing multiple defamation lawsuits outside her

---

[7] For example, as recently as June 2026, Wilkins was in the District of Columbia to perform at an event on the National Mall. *See* Ryan Mancini, *Kash Patel girlfriend to perform at Trump rally marking America 250th kickoff*, The Hill (June 24, 2026), https://thehill.com/homenews/administration/5937867-alexis-wilkins-trump-rally-performance.

[8] The Court can consider Wilkins' LinkedIn profile in conjunction with Defendants' venue arguments. *See Carrico v. Uponor, Inc.*, 2025 WL 967542, at *7 (M.D. Tenn. Mar. 31, 2025) (Richardson, J.) (taking judicial notice of statements by defendants on publicly accessible sources, including websites and social media, on motion to dismiss).

13

alleged home state, in an array of states where she alleged the defendants reside, including in

Florida, Texas, and Utah.[9]

Even giving Wilkins' choice of forum "deference," *Sacklow*, 377 F. Supp. 3d at 878, her

choice is outweighed in this case. The only factor supporting venue in Tennessee is Wilkins'

alleged residence, but that factor is mitigated by her extensive litigation docket, which makes

clear she is not inconvenienced by litigating cases in far-flung jurisdictions around the country –

particularly in a jurisdiction like the District of Columbia, where she already spends time. On

the other side of the ledger, the other key witnesses – including reporters, editors, Patel, and the

FBI spokesperson – and the locus of operative facts are all in the District of Columbia. These

factors weigh in favor of transferring this action to the District of Columbia.

## III.    THE COURT SHOULD DISMISS FOR FAILURE TO STATE A CLAIM.

If this Court has jurisdiction over Defendants and retains the case, it should dismiss the

Complaint for failure to state a claim. Viewed as a whole, as the law requires, the Article simply

does not support Wilkins' claims.

### A.    Wilkins Cannot State a Claim for Defamation as a Matter of Law.

To state a claim for defamation under Tennessee law,[10] Wilkins must plausibly allege that

Defendants published a statement that is "false and defaming" to her, with the requisite level of

fault. *See Seaton v. TripAdvisor LLC*, 728 F.3d 592, 596-97 (6th Cir. 2013) (quoting *Sullivan v.*

---

[9] *See Wilkins v. Schaffer*, No. 9:25-cv-91334 (S.D. Fla.); *Wilkins v. Seraphin*, No. 1:25-cv-01375 (W.D. Tex.); *Wilkins v. Parker*, 2:25-cv-00987 (D. Utah).

[10] For purposes of this Motion only, Defendants accept as true Wilkins' allegation that she resides in Tennessee, Compl. ¶ 2, and assume that Tennessee law applies to her claims. *See Hataway v. McKinley*, 830 S.W.2d 53, 57 (Tenn. 1992) (Tennessee applies the "law of the state where the injury occurred . . . unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties"). To the extent that any of Wilkins' claims survive, Defendants reserve the right to argue that a different state's law applies.

14

*Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999)).[11]  Wilkins must also plead and ultimately prove actual damages.  *See Davis v. Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001).[12]

To be actionable as defamation, a statement "must constitute a serious threat to the plaintiff's reputation," carrying an "element of disgrace."  *Hudik v. Fox News Network, LLC*, 512 F. Supp. 3d 816, 825 (M.D. Tenn. 2021) (Richardson, J.) (quoting *Tidwell v. Holston Methodist Fed. Credit Union*, 2020 WL 3481537, at *4 (Tenn. Ct. App. June 25, 2020)).  It is not enough for a statement to be "annoying, offensive, or embarrassing."  *Id*.  Rather, the challenged statement "must reasonably be construable as holding the plaintiff up to public hatred, contempt, or ridicule."  *Id.*

The Court decides in the first instance, "as a question of law, whether statements are capable of having a defamatory meaning."  *Hudik*, 512 F. Supp. 3d at 825 (citing *Aegis Scis. Corp. v. Zelenik*, 2013 WL 175807, at *7 (Tenn. Ct. App. Jan. 16, 2013)).  In doing so, courts "look to the words themselves and are not bound by the plaintiff's interpretation of them."  *Id.* (quoting *Tidwell*, 2020 WL 3481537, at *4).  The statements "should be read as a person of

---

[11] While not the subject of this Motion, as "a country singer, author, and political advocate" with a well-known "brand," Compl. ¶ 32, Wilkins is a public figure who would need to demonstrate by clear and convincing evidence that Defendants published the Article with actual malice, *i.e.*, knowing the challenged statements were false or actually entertaining serious doubts about their truth.  *See Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 527 (6th Cir. 2014) (limited-purpose public figures must demonstrate actual malice for defamation claims); *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 647 (Tenn. 2001) (actual malice required for false light claims where a plaintiff is a public official, a public figure, or the publicity is a matter of public interest).

[12] Although the Complaint refers to both defamation and defamation *per se*, defamation *per se* "no longer exists as a separate cause of action in Tennessee."  *Steele v. Ritz*, 2009 WL 4825183, at *1 n.2 (Tenn. Ct. App. Dec. 16, 2009).  Plaintiffs are instead required to "allege and prove injury" to sustain any defamation claim.  *Id.*

15

ordinary intelligence would understand [them] in light of the surrounding circumstances." *Aegis Scis.*, 2013 WL 175807, at *6. This determination is made based on a review of the publication at issue and considering the challenged statements in context. *See West v. Media Gen. Ops. Inc.*, 120 F. App'x 601, 617 (6th Cir. 2005) (a "court should be always mindful of the caveat that the words of the publication should not be considered in isolation, but rather within the context of the entire publication") (quoted in *Hudik*, 512 F. Supp. 3d at 832).

Critically, the allegedly defamatory statement must be *about* the plaintiff. *Steele*, 2009 WL 4825183, at *3; *see also Hudik*, 512 F. Supp. 3d at 825 ("The words must reasonably be construable as holding *the plaintiff* up to public hatred, contempt or ridicule." (quoting *Tidwell*, 2020 WL 3481537, at *4) (emphasis added)). A plaintiff "may not support a claim for defamation based on an alleged defamatory statement made 'of and concerning' a third party." *Steele*, 2009 WL 4825183, at *3; *see also Lyons v. State*, 1993 WL 414840, at *3 (Tenn. Ct. App. Oct. 20, 1993) (plaintiff must prove that they were the "subject" of the defamatory statement) (quoting *Stones River Motors, Inc. v. Mid-S. Publ'g Co.*, 651 S.W.2d 713 (Tenn. Ct. App. 1983)). This requirement also has a constitutional dimension. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 288 (1964) (evidence was "constitutionally defective" where "it was incapable of supporting the jury's finding that the allegedly libelous statements were made 'of and concerning' respondent"); *see also Steele*, 2009 WL 4825183, at *3 n.4 (citing cases holding that the "of and concerning" requirement is "a matter of federal constitutional law").

When a publication cannot reasonably be construed to convey the defamatory meaning alleged by the plaintiff, defamation claims are dismissed as a matter of law. *See Puckett v. Am. Broad. Cos.*, 917 F.2d 1305 (6th Cir. 1990) (defamation claim failed as a matter of law where news segment could not be reasonably construed as portraying plaintiff as a prostitute);

16

*Schuchardt v. Bloomberg L.P.,* 2024 WL 1144226, at *20 (M.D. Tenn. Mar. 15, 2024) (granting motion to dismiss where statements were "not capable of conveying a defamatory meaning"); *Davis v. Covenant Presbyterian Church of Nashville*, 2015 WL 5766685, at *4 (Tenn. Ct. App. Sept. 30, 2015) (trial court erred in failing to dismiss defamation case where email was "not capable of conveying a defamatory meaning").

Here, Wilkins' claim fails as a matter of law because she has not – and cannot – point to anything in the Article that is both "of and concerning" her and reasonably capable of a defamatory meaning. The crux of Wilkins' claim is that the Article defamed her by suggesting she "abused FBI resources." Compl. ¶ 1. She bases that claim on the contention that Defendants "falsely asserted that Ms. Wilkins demanded, and Director Patel ordered, that federal agents assigned to her security detail . . . escort an intoxicated friend home 'after a night of partying.'" *Id.*; *see also id.* ¶¶ 30-32 (allegations in defamation claim). Her claim fails for at least four reasons.

***First***, nothing in the Article states that Wilkins "demanded" anything. Instead, the Article says that she "asked" and "requested" that FBI agents escort her inebriated friend home. Compl. ¶ 10. Asking and requesting are hardly "demanding." In fact, the Article makes clear that Wilkins did not have the authority to "demand" the FBI do anything. Rather, according to the Article, the agents "objected" to her requests, and it was *Patel* who "ordered" them to give the friend a ride. Ex. 1 at 1. Patel was the one who gave the direction, "insisted that they do as Wilkins requested," and "yelled" at the leader of the security detail. *Id.* Indeed, Wilkins herself characterizes the Article as a "hit piece" against *Patel*. Compl. ¶ 23. But the reporting about Patel's conduct is not "of and concerning" Wilkins and cannot form the basis of her defamation claim. *See Steele*, 2009 WL 4825183, at *3 (dismissing defamation claim because, although

17

publication "contain[ed] an alleged defamatory statement," it was not "of and concerning" plaintiffs).

*Second*, merely portraying Wilkins as the "beneficiary" of Patel's conduct does not defame her. *See* Compl. ¶ 25. In *Aegis Sciences Corp. v. Zelenik*, for example, the defendant ran an advertisement stating that a state senator's "spending spree included a million bucks for a drug testing company" owned by her husband, accompanied by an image of the senator handing her husband a check for $1 million, payable to the company and on the account of "Tennessee Taxpayers." 2013 WL 175807, at *1. The company sued, alleging that the advertisement falsely depicted it as having "accepted or solicited 'graft'" from the senator. *Id.* at *5. The court rejected that argument, concluding that, "reasonably construed," the advertisement merely conveyed that the company "benefitted" from the senator's "spending spree," a message incapable of holding the company "up to public hatred, ridicule, or disgrace." *Id.* at *6. The same is true here.

*Third*, what the Article does report about Wilkins' conduct is not defamatory. Reporting on her request to the FBI, even if she did not actually make the request, is simply not the kind of thing that would subject Wilkins to "hatred, contempt, or ridicule." *Hudik*, 512 F. Supp. 3d at 825. It merely suggests that Wilkins was trying to make sure her friend got home safely. And, nothing in the Article could be reasonably understood to convey that Wilkins "abused FBI resources." In fact, Wilkins does not even allege that readers understood the Article that way. Rather, she alleges that her reputation "*would* be" damaged "*if* her employers, her publishers, her listeners, or her readers believed that she was abusing the public trust." Compl. ¶ 32 (emphasis added); *see also Davis*, 2015 WL 5766685, at *4 (even where the plaintiff understood a particular communication in a defamatory manner, that did not mean it could "reasonably be

18

construed as defamatory"). Again, the person who gave the order to drive the friend home was Patel – a point the Complaint emphasizes repeatedly. *See, e.g.*, Compl. ¶¶ 1, 12, 23, 30, 31.

***Finally***, even if some readers might view Wilkins' request negatively or as an inappropriate request of the agents, a statement is not defamatory based on the mere fact that it "may reflect somewhat negatively" on the plaintiff. *Hudik*, 512 F. Supp. 3d at 830; *see also Whiting v. City of Athens*, 699 F. Supp. 3d 652, 664 (E.D. Tenn. 2023) ("Just because the statement was communicated to the public and mentioned Whiting by name does not mean it is defamatory in nature; nor does his expressed discomfort with the statement and the publicity it attracted make it so.").

Because Wilkins has not identified any actionable statement – that is, any allegedly false statement that could subject her, specifically, to hatred, contempt, and ridicule – her defamation claim fails as a matter of law and must be dismissed.

### B.      Wilkins Fails to State a Claim for False Light Invasion of Privacy.

Wilkins' claim for false light invasion of privacy also should be dismissed as a matter of law, as the Article does not convey the implication that Wilkins contends casts her in a false light. At the outset, "the court's job is to determine if [1] the identified statements are capable of portraying the plaintiff in a false light [2] that is highly offensive to a reasonable person." *Schuchardt*, 2024 WL 1144226, at *14. Both inquiries present threshold questions of law. *Id.* Wilkins' claim fails on both scores.

### i.      The Article Does Not Imply Wilkins Was Inebriated.

Wilkins alleges that the "framing" of the Article suggests "she was inebriated and is a heavy drinker, who regularly parties late at night." Compl. ¶ 42. As with her defamation claim, the Court need not accept Wilkins' interpretation of the Article. *See Loftis v. Rayburn*, 2018 WL

1895842, at *8 (Tenn. Ct. App. Apr. 20, 2018) ("For the reasons we found the statements in [the] article fail to imply a defamatory meaning, we also find they are not susceptible to the requisite inferences casting [plaintiff] in a false light."); *see also Schuchardt*, 2024 WL 1144226, at *20 (dismissing false light claim where statements did not convey the "false light that [plaintiff] ascribes to them when they are considered in context").

Here, the Article does not imply that Wilkins was inebriated, much less that she is a "heavy drinker." Compl. ¶ 42. Although the Article states that her friend was "allegedly inebriated," it says nothing at all about Wilkins' consumption on the nights in question, let alone whether she ever drinks alcohol. *See Hall v. Metro Gov't of Nashville & Davidson Cnty.*, 2018 WL 305751, at *6 (M.D. Tenn. Jan. 5, 2019) (false light claim failed where publication "did not present [plaintiff's] version of events, but it did not speculate as to [plaintiff's] guilt or innocence either"). In any event, reporting that Wilkins has a friend who was inebriated certainly does not suggest that Wilkins is a "heavy drinker" as her Complaint contends. Compl. ¶ 42. Nor does it suggest that she "regularly parties late at night," *id.*, as the Article states only that a friend was inebriated "at least two times," Ex. 1 at 1. The Article does not even say that Wilkins was with the friend on those nights.

It also makes no difference that the events in question occurred in Nashville. Compl. ¶ 22. Wilkins contends the Article's reference to the city is significant because it is "known for late-night partying and drinking." *Id.* But Nashville also is where Wilkins allegedly resides, so it would be natural for her to have a friend in that city. And, even if the Article could be read to suggest that Wilkins was with the friend, nothing about her friend drinking alcohol in Nashville suggests Wilkins was inebriated too.

As the Article simply does not portray Wilkins in the false light she contends, her claim fails as a matter of law.  *See Gunter v. Emerton*, 2002 WL 1015808, at \*3 (Tenn. Ct. App. May 21, 2002) (affirming dismissal of false light claim where defendant "did not publish any information that was misleading or that would produce a false impression" about plaintiff); *see also Seaton v. TripAdvisor LLC*, 728 F.3d 592, 601 n.9 (6th Cir. 2013) (dismissal of false light claims is appropriate where a plaintiff cannot prove falsity).

Nevertheless, even if the Article could somehow be read to report that Wilkins had been drinking "on more than one occasion," Ex. 1 at 1, her pleading shows that placing her in that light would not be a "major misrepresentation" of her activities, as required for the false light tort.  *Harris v. Gaylord Ent. Co.*, 2013 WL 6762372, at \*6 (Tenn. Ct. App. Dec. 19, 2013) (quoting RESTATEMENT (SECOND) OF TORTS § 652E cmt. c) (1977)).  After all, Wilkins herself concedes that, at times, she *does* drink alcohol.  Compl. ¶ 22 (acknowledging she "*very rarely drinks*, if ever") (emphasis added).

### ii.     The Alleged Implication Is Not Highly Offensive.

Even if Wilkins' interpretation of the Article were a reasonable one – and it is not – her claim would still fail because the Article does not convey anything "highly offensive" about her.  As the Supreme Court of Tennessee has recognized, a "plaintiff cannot recover under a false light claim" where the matter would not be "seriously offensive" to a reasonable person.  *See West*, 53 S.W.3d at 646.  In other words, it is not enough that a plaintiff is "personally offended" – she must "be justified in the eyes of the community in feeling seriously offended and aggrieved" by the Article's portrayal of her.  *Harris*, 2013 WL 6762372, at \*6 (quoting RESTATEMENT (SECOND) OF TORTS § 652E cmt. c) (1977)).  Whether something is highly offensive is "largely a matter of social conventions and expectations as recognized by the law."  *Id.*

21

Neither the actual statements nor the alleged implications rise to this level. The Article merely states that, on "more than one occasion," Wilkins asked FBI agents to give an inebriated friend a ride home. That could not be highly offensive to anyone. But even assuming the Article portrays Wilkins as also being inebriated (which it does not), the suggestion that an adult of legal drinking age imbibed while with a friend in Nashville would not be highly offensive to a reasonable person. *Cf. State v. Itzol-Deleon*, 2016 WL 1192806, at *26 (Tenn. Crim. App. Mar. 28, 2016) ("Alcohol consumption, standing alone, is neither illegal nor stigmatized in the community such that its inclusion in trial testimony would prejudice the Defendant."), *aff'd on other grounds*, 537 S.W.3d 434 (Tenn. 2017). Indeed, Wilkins herself emphasizes that Nashville "is known for late-night partying and drinking," Compl. ¶ 22 – a reputation that may be "known," but certainly is not highly offensive given the number of people who enjoy the city's nightlife and the scope of the marketing surrounding it. Simply stated, any suggestion that Wilkins was inebriated while enjoying a night out with her friend is not the kind of portrayal that would be highly offensive to a reasonable person. *Compare Malmquist v. Hearst Corp.*, 2010 WL 1257800, at *5 (W.D. Tenn. Mar. 26, 2010) (portraying someone as an "abusive spouse" is highly offensive), *and Hudik*, 512 F. Supp. 3d at 835 (accusing someone of "perpetuating a 'scam'" is highly offensive), *with Harris*, 2013 WL 6762372, at *7 (statement implying that someone was not invited to event was not highly offensive), *and Int'l Union v. Garner*, 601 F. Supp. 187, 190 (M.D. Tenn. 1985) ("A reasonable person would not be offended by the revelation that another person was engaged in union organization activity."); *accord Causey v. Dore*, 2021 WL 5904090, at *4 (6th Cir. Dec. 14, 2021) (under Michigan law, statement that plaintiff did not pay rent was not highly offensive).

Furthermore, while Wilkins claims that her "professional identity" is as a "sober young woman who does not partake in the excess drinking culture and party scene," Compl. ¶ 45, she does not deny that she goes out with her friends in Nashville or that some of them drink alcohol. She even acknowledges that she sometimes drinks, too. *See id.* ¶ 22. In fact, Wilkins' own public profile illustrates that being associated with alcohol is not highly offensive to a reasonable person. For instance, her song lyrics contain odes to alcohol, including the lyrics "nothin' gets me quite like whiskey," and she has promoted Busch Light beer, including by posting a video of herself chugging one while beer splashes on her chest.[13]

Regardless, the false light tort does not ask a subjective question – that is, it does not turn on Wilkins' self-proclaimed "professional identity," nor does it matter whether she is "personally offended." The tort's inquiry is an objective one. *See Harris*, 2013 WL 6762372, at *6. The answer here is straightforward. Any alleged portrayal of Wilkins as drinking alcohol with a friend would not cause a reasonable person to take "serious offense." *Id.* (quoting Restatement (Second) of Torts § 652E cmt. c) (1977)).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiff's Complaint for lack of personal jurisdiction, transfer the action to the United States District Court for the District of Columbia, or dismiss the Complaint with prejudice for failure to state a claim.

---

[13] *See* https://www.youtube.com/watch?v=gMJu4XhixoU (Wilkins' song "Quite Like Whiskey"); https://www.instagram.com/p/CfKnFVMpGl_/ (video posted to Wilkins' Instagram account promoting Busch Light); Ex. 3 (screenshots of posts and videos from Wilkins' Instagram account).

23

Dated: August 11, 2026

Respectfully submitted,

/s/ *Michael Berry*
Michael Berry (*pro hac vice*)
Jacquelyn N. Schell (*pro hac vice*)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
berrym@ballardspahr.com
schellj@ballardspahr.com

Ty E. Howard (No. 26132)
Brooke Sgambati
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway, Suite 2400
Nashville, TN 37203
(615) 244-2582
thoward@bradley.com
bsgambati@bradley.com

*Counsel for Defendants Versant Media Group, Inc., Carol Leonnig, and Ken Dilanian*

24