UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville Division

| | |
|---|---|
| ALEXIS WILKINS,<br><br>Plaintiff,<br><br>v.<br><br>VERSANT MEDIA GROUP, INC. d/b/a MS NOW et al.,<br><br>Defendants. | Case No.: 3:26-cv-725-EJR-LAE |

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR TO TRANSFER**

Defendants published a false and sensationalized story accusing Plaintiff, Alexis Wilkins, of ordering her FBI security detail to chauffeur her inebriated friends home after nights of partying in Nashville. Yet, when Ms. Wilkins brought this action in her home forum—Nashville—based on a story centered on Nashville, Defendants now move to dismiss for lack of personal jurisdiction, or to transfer venue. Defendants also move to dismiss for failure to state a claim. Their motion fails on every front. The article's Tennessee focus and knowing aim at a Tennessee resident establish personal jurisdiction under Supreme Court and Sixth Circuit precedent. Furthermore, the balance of convenience does not overcome Ms. Wilkins's substantial choice of forum. And the statements are more than capable of defamatory meaning—and of casting Ms. Wilkins in a highly offensive false light—by portraying her as misusing federal agents as a personal car service and as a habitual late-night partier. Accordingly, the motion to dismiss or transfer should be denied in full.

## BACKGROUND

Alexis Wilkins is a country singer, author, and political advocate who resides in Nashville, Tennessee. Compl. ¶ 9. She is known for her Christian and patriotic values, and she is in a personal relationship with FBI Director Kash Patel. *Id.* Ms. Wilkins' professional identity is that of a responsible, sober young woman who does not partake in the excess drinking culture and party scene that is typical for musicians. *Id.* ¶ 45.

In late 2025, due to credible death threats fueled by the very kinds of lies Defendants spread, the FBI assigned a security detail to protect Ms. Wilkins. *Id.* ¶ 14. Defendants themselves were the first to report on this detail—in an article published November 17, 2025. *Id.*

On December 5, 2025, Defendants published an article titled "Kash Patel ordered FBI detail to give girlfriend's pal a lift home: sources" (the "Article"). *Id.* ¶ 10. The Article's lead paragraph reported:

> FBI Director Kash Patel has—on more than one occasion—ordered that the security detail protecting his girlfriend escort one of her allegedly inebriated friends home after a night of partying in Nashville, according to three people with knowledge of the incidents.

The Article further stated that "Patel's girlfriend, Alexis Wilkins, asked FBI agents on her security team at least two times, including once this spring, to drive her friend home." *Id.* This is entirely false. The events described in the Article never happened even once, let alone multiple times. *Id.* ¶ 12.

Moreover, the Article's own timeline refutes its core allegation. It claims events occurred in Spring 2025, but Ms. Wilkins did not have a security detail in Spring

2025. *Id.* ¶ 13. Defendants were aware of this because they themselves first reported on the detail on November 17, 2025. *Id.* ¶ 14.

Three days before publication, on December 2, 2025, Defendant Dilanian reached out to FBI spokesperson Ben Williamson. *Id.* ¶ 15. Williamson investigated, speaking to all potential witnesses including every member of Ms. Wilkins' security detail. He found no record of the events anywhere. *Id.* ¶ 16. He then told Dilanian exactly what he found. *Id.* ¶ 16. Dilanian had no name. No date. No friend. No corroborating detail of any kind. Just "comfortable with our sourcing." And he, and Defendants, ran the story anyway. *Id.*

The Article was a hit piece designed to paint Ms. Wilkins as someone who treats federal law enforcement as her personal car service, an abuse of public trust. Accordingly, on May 29, 2026, Ms. Wilkins brought this current action.

## ARGUMENT

### I. Defendants are subject to personal jurisdiction in Tennessee.

In Tennessee, the plaintiff bears the burden of persuasion on personal jurisdiction. *Mark Hanby Ministries, Inc. v. Lubet*, 2007 WL 1004169, at *4 (E.D. Tenn. Mar. 30, 2007) (quoting *S & S Screw Mach. Co. v. Cosa Corp.*, 647 F. Supp. 600, 605 (M.D. Tenn. 1986)). In an action based in diversity, as here, courts look to state law. *Id.* Under Tennessee's long-arm statute, "Tennessee courts exercise personal jurisdiction 'to the full limit allowed by due process." *Id.* (quoting *Third Nat'l Bank in Nashville v. WEDGE Group Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989)). "Under the Due Process Clause, a forum may exercise personal jurisdiction over a

nonresident who has 'purposefully directed activities toward residents of the forum since '[a] State generally ha[s] a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.'" *Id.* at *5 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)).

Courts in this Circuit follow a three-prong test for determining specific jurisdiction, requiring a plaintiff to establish:

> 1) the defendant purposefully availed himself of the privilege of acting in the forum state or causing a consequence in the forum state, 2) the cause of action arose from the defendant's activities in the forum state, and 3) the acts of the defendant or consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction reasonable.

*Id.* (quoting *First Tenn. Nat. Corp. v. Horizon Nat'l Bank*, 225 F. Supp. 2d 816, 820 (W.D. Tenn. 2002) (citing *S. Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). "The showing required for the assertion of specific jurisdiction is considerably less than that required for general jurisdiction and a plaintiff must merely demonstrate his cause of action arises out of the defendant's forum-related contacts." *Hamilton Cnty. Emergency v. Orbacom Commc'ns Integrator Corp.*, No. 1:04-cv-7, 2005 WL 1513166, at *4 (E.D. Tenn. Jun. 24, 2005). Here, Ms. Wilkins can make a prima facie showing of each prong, thereby satisfying personal jurisdiction over Defendants.

### A. Defendants purposefully directed their conduct at Tennessee.

Defendants' jurisdictional argument hinges on the premise that their Article was published to a national audience without any particular targeting of Tennessee. But this framing ignores critical facts alleged in the Complaint, and those contained

in the Article, that distinguish this case from the general publication cases on which Defendants rely.

The Sixth Circuit's framework makes clear that the "focal point" of the challenged publication is critical to the jurisdictional analysis. *See Blessing v. Chandrasekhar*, 988 F.3d 889, 906 (6th Cir. 2021). While Defendants wish to portray the Article as being "about" the FBI Director generally, the Complaint alleges that it is equally "about" Ms. Wilkins—accusing her of requesting FBI agent escorts for her inebriated friends, depicting her and her friends as frequently partying and drinking in Nashville, and portraying her as abusing government resources. The focal point of the article therefore centers on Ms. Wilkins and the specific location of Nashville, Tennessee.

The Article here centers on events alleged to have occurred in Nashville, Tennessee. The Article states that Wilkins' friend was given a ride home "after a night of partying in Nashville." The purported misuse of FBI resources to benefit Ms. Wilkins, a Tennessee resident, during multiple alleged nights out in Nashville—a city in Tennessee known for late-night drinking and partying—is not only specifically about events and persons in the forum state, but the sensational nature of the story is augmented by the fact of these supposed incidents occurring specifically in Nashville, a party-town (as opposed to, say, Columbus, Ohio).

Moreover, Defendants were aware that Ms. Wilkins and her friends—subjects of the article—reside in Nashville. Defendants had previously reported on Ms. Wilkins' Nashville residence and her security detail there. When reporters knowingly

publish defamatory statements about a person they know to reside in a particular forum, and those statements describe events occurring in that forum, they can reasonably anticipate being haled into court there. *See Calder v. Jones*, 465 U.S. 783, 789–90 (1984) (jurisdiction proper where defendants' "intentional, and allegedly tortious, actions were expressly aimed at" the forum state and "they knew that the brunt of [the] injury would be felt by [plaintiff] in the State in which she lives and works"). As noted in *Calder*, "an individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." *Id*. The same applies here.

Defendants primarily rely on *Blessing* to argue against personal jurisdiction, but that case is readily distinguishable. In *Blessing*, the defendants were private individuals posting on Twitter to their personal followers about a news event that happened to involve Kentucky students; they took "no affirmative steps to direct any communications to the plaintiffs or to anyone else in Kentucky." *Blessing*, 988 F.3d at 906. While the plaintiffs were from Kentucky, that was the *only* connection to Kentucky. *Id*. The postings focused on the plaintiffs attending an event in Washington, D.C. and were directed at a nationwide audience. *Id*. The forum was not the focus of the story, as in *Calder*. *Id*. (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)). What matters is a defendant's connections with the forum itself, not connections with a plaintiff who happens to reside in the forum. *Id*. at 904.

Here, by contrast, Defendants are professional journalists employed by a major news organization who: (a) wrote an article specifically about a Tennessee resident;

(b) reported on events that allegedly occurred in Tennessee; (c) knew the plaintiff lived in Tennessee; (d) knew that the location of these events in Nashville enhanced the sensationalist aspect of the story concerning late-night drinking; and (e) knew the brunt of any reputational harm would be felt in Tennessee, where Ms. Wilkins lives and works as a country singer. Additionally, to the extent Defendants argue they did, in fact, rely on any sources with firsthand knowledge—Ms. Wilkins contests this fact––they undoubtedly would have needed to be Tennessee sources, *i.e.*, agents in Tennessee who are part of Ms. Wilkins's security detail.

Instead, this case more closely resembles *Johnson v. Griffin*, where the Sixth Circuit found personal jurisdiction because the defendant "intentionally targeted" Tennessee. 85 F.4th 429, 434 (6th Cir. 2023). Therefore, the court found the conduct akin to that in *Calder*. *Id*. at 433. Specifically:

> As in *Calder*, the allegedly tortious story concerned the [Tennessee] activities of a [Tennessee] resident. It impugned the professionalism of [an executive] whose [ ] career was centered in [Tennessee]. And the tweet was drawn from [Tennessee] sources. Griffin intended that the 'brunt of the harm' would befall Johnson in Tennessee when she urged her followers to pressure VisuWell, a Tennessee-based company, to fire him and urged VisuWell to remove him from the Board.

*Id*. (quoting *Calder*, 465 U.S. at 788–799) (internal quotations and citations omitted). The defendant's emphasis of the forum drove home the idea that the defendant "'undoubtedly knew' that the 'focal point' of her tweets concerned Tennessee. *Id*. (citing *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007)). A defendant "does not inoculate herself from personal jurisdiction in a targeted state" merely because the posting also went to their millions of readers in

all 49 other states. "Targeting [the plaintiffs] in Tennessee, based exclusively on conduct in Tennessee, and urging action in response in Tennessee, 'tether[ed]' those effects to the forum." *Id*. at 435 (quoting *Blessing*, 988 F.3d at 906).

While the targeting in *Johnson* took the form of communications with the plaintiff's Tennessee employer, the principle is the same: when a defendant's tortious conduct is knowingly aimed at a person in the forum, effects the career of someone in the forum, concerns events in the forum, and purports to rely on sources within the forum, jurisdiction is proper. The Article here does not merely mention Tennessee in passing; the location is central to the story.

Also illustrative is *StarForce Nat'l Corp. v. Transcor, Inc.* There, the Southern District of Ohio also found the facts of the case akin to *Calder* where: (1) the alleged defamatory statements "concerned the Ohio activities of an Ohio corporation"; (2) the statements impugned the professionalism and reputation of an Ohio corporation; (3) "the brunt of the harm was suffered in Ohio"; (4) "in intentionally acting to harm [the plaintiff's] business, [the defendant] aimed her actions towards [the plaintiff's] base of operations in Ohio." *StarForce Nat'l Corp. v. Transcor, Inc.*, No. 1:10-cv-84, 2010 WL 11639831, at *13 (S.D. Ohio Dec. 15, 2010). The court found it to be of no consequence that the defendant never acted in any capacity in Ohio, and that there were no allegations in the complaint that the defendant circulated the false statements in Ohio. *Id*. at *14. Furthermore, while the plaintiff did not allege that Ohio was the focal point, it was still plausible that Ohio was the focal point given the plaintiff's residency in Ohio. *Id*. Lastly, the court explicitly distinguished the case

from *Reynolds*—one of the cases chiefly relied upon in *Blessing*—because *Reynolds*, like *Blessing*, involved a publication on events occurring *outside* of Ohio and the plaintiff's career was not centered in Ohio. *Id*. at *13. Here, as discussed, Defendants' story concerned the Tennessee activities of a Tennessee resident, it impugned Ms. Wilkins' reputation and professionalism in Tennessee where she carries out her music career, Ms. Wilkins suffered her primary harm in Tennessee, where she resides and works, and by intentionally acting to harm Ms. Wilkins, Defendants aimed their statements at Ms. Wilkins in Tennessee.

Defendants argue that they have a national audience, and the Article's focus is on Dir. Patel and Washington, D.C., attempting to analogize this case to *Blessing*. Dkt. No. 23.1 at 10. As *Johnson* makes clear, however, the mere fact that the defendant has a national audience is of no consequence if they targeted the forum. And while portions of the Article may be about Dir. Patel, it is undoubtedly about Ms. Wilkins and her Tennessee activities.

In sum, the Supreme Court's decision in *Calder* remains binding and directly applicable to cases involving intentional torts committed through publication. *See Calder*, 465 U.S. at 791. Under *Calder*, jurisdiction exists where: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum state; and (3) the defendant knew the plaintiff would suffer the harm there. *Id*. at 789–90. As illustrated, Ms. Wilkins satisfies all three elements.

Although the Sixth Circuit has narrowed *Calder*'s application in the internet-publication context, it has not abrogated the effects test entirely. *See Blessing*, 988

F.3d at 906. Rather, *Blessing* instructs that something more than the plaintiff's residence in the forum is needed. Here, that "something more" exists: the Article reports on Tennessee-based events, the Article uses the Tennessee location (specifically, Nashville) to play up the sensational aspect of the story, Defendants had prior knowledge of Ms. Wilkins' Tennessee residence and the fact that she makes a living as a country singer primarily in Tennessee, and the defamatory statements target Ms. Wilkins' Tennessee-based professional identity and reputation.

**B. The cause of action arises from Defendants' contacts.**

"The second prong of the test requires that the action 'arise from' the defendant's activities in the forum." *Hamilton Cnty. Emergency*, 2005 WL 1513166, at *7 (citing *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 477–78 (6th Cir. 2003)). "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contracts." *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002) (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996)). This is a "lenient" standard. *StarForce Nat'l Corp.*, 2010 WL 11639831, at *14 (quoting *Fortis Corporate Ins. v. Viken Ship Mgmt.*, 450 F.3d 214 (6th Cir. 2006)). As in *StarForce*, Ms. Wilkins' cause of action "flow[s] from the statements [Defendants] allegedly made, and the alleged harm . . . occurred in [Tennessee]." *Id.*; *see CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1267 (1996); Fortis Corporate Insurance v. Viken Ship Management, 450 F.3d 214, 223 (6th Cir. 2006).* It was Defendants' statements, which are its contacts with Tennessee, that gave rise to this case. *See id.* Accordingly, the second prong of the

test is also met. *See also Hinson v. Yates*, 2018 WL 3621043, at *9 (W.D. Mich. Jul. 9, 2018), *report and recommendation adopted*, 2018 WL 3619267 (W.D. Mich. Jul. 30, 2018) (finding the second prong satisfied—even though the statements were posted from other states—because the postings were directed at a Michigan resident and impacted the plaintiff's business in Michigan).

**C. Jurisdiction in Tennessee is reasonable.**

The third factor requires that "the exercise of jurisdiction be reasonable in light of the connection that allegedly exists between [Defendants] and [Tennessee]." *Bird*, 289 F.3d at 875. "An inference arises that the third factor is satisfied if the first two requirements are met." *Id.* (citing *CompuServe, Inc.*, 89 F.3d at 1268). In determining this factor, courts look to "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Hamilton Cnty. Emergency*, 2005 WL 1513166, at *7 (quoting *Youn v. Track, Inc.*, 324 F.3d 409, 419 (6th Cir. 2003)).

Here, Defendants do not even attempt to argue that they would suffer any personal burden. Therefore, they have waived this argument. *Jefferson v. General Motors, LLC*, 344 F.R.D. 175, 190 (W.D. Tenn. 2023) ("Defendant raises this argument for the first time in its Reply, and in general 'arguments made to us for the first time in a reply brief are waived.'" (quoting *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010)). Even if Defendants did argue a burden, as Defendants themselves recognize, MS NOW is a national media company with millions of viewers, and, therefore, the resources to defend this action. Furthermore, as to the individual

Defendants, they are represented by the same lawyers as MS NOW, alleviating the burden on them. *See StarForce Nat'l Corp.*, 2010 WL 11639831, at *14 ("Here, the burden on Ms. Breit is not severe given that she is represented by the same counsel as her employer."). And because Defendants aimed their conduct at Tennessee, "they should be expected to bear the burden of coming to court here." *Hamilton Cnty. Emergency*, 2005 WL 1513166, at *7. "Furthermore, [Ms. Wilkins'] and [Tennessee's] interests in seeing justice done overrides the inconvenience of [Defendants] potentially having to appear in [Tennessee] rather than in another district court in another state." *StarForce Nat'l Corp.*, 2010 WL 11639831, at *14. *See Crouch Railway Consulting, LLC v. LS Energy Fabrication, LLC*, 610 S.W.3d 460, 486 (Tenn. 2020) ("Tennessee has a corresponding manifest interest in providing residents with a convenient forum for redressing injuries inflicted by out-of-state actors.").

Accordingly, Ms. Wilkins has made out a prima facie case that Defendants are subject to personal jurisdiction in Tennessee, and Defendants have failed to otherwise rebut this showing.

## II. Transfer would be improper.

While a district court possesses broad discretion to transfer a case to a different district, the moving party has a *substantial* burden, which "requires a clear and convincing showing that the balance of convenience strongly favors the alternate forum." *Finley v. Kelly*, 384 F. Supp. 3d 898, 903 (M.D. Tenn. 2019) (quoting *Doe v. United States*, 2017 WL 4864850, at *2 (M.D. Tenn. Oct. 26, 2017)). "To resolve a motion to transfer venue, a court considers: the plaintiff's choice of forum, the

convenience of the witnesses and the residence of the parties, the location of sources of proof, including the availability of compulsory process to insure witness attendance, the location of the events giving rise to the dispute, any obstacles to a fair trial, the advantage of having the dispute adjudicated by a local court, and all other considerations of a practical nature that make a trial easy, expeditious, and economical." *Id.* (quoting *Maples v. United States*, 2018 WL 943213, at *1–2 (M.D. Tenn. Feb. 16, 2018)). "'Generally, one of the most significant factors in considering whether venue should be transferred is the plaintiff's choice of forum,' and, therefore, 'plaintiff's choice of forum is usually entitled to 'substantial consideration' in balancing the § 1404(a) factors.'" *Id.* (quoting *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954, 962 (M.D. Tenn. 2008)); *see also Forward Air, Inc. v. Dedicated Xpress Services, Inc.*, 2001 WL 34079306, at *5 (E.D. Tenn. Dec. 13, 2001) (same).

As an initial matter, Ms. Wilkins's choice of forum is this District. As this District recently noted, that is entitled "substantial consideration." Therefore, as a starting point, transfer should be discouraged. While Ms. Wilkins occasionally travels to places such as Washington, D.C. for her personal life, this does not change that her primary residence is in this District and is where she is pursuing her career. Instead, transferring this case would merely shift the burden. *See Sacklow v. Saks Inc.*, 377 F. Supp. 3d 870, 879 (M.D. Tenn. 2019) ("A transfer at the behest of a defendant is disfavored where it merely shifts the burden of litigating in an inconvenient forum to the plaintiff.").

Defendants largely focus on the convenience of witnesses. While Defendants are correct that there are many witnesses located in Washington, D.C., Defendants ignore the significant number of witnesses in this District. Most notably, witnesses who can testify directly as to the falsity in Defendants' statements are those on Ms. Wilkins's security details and her friends who were discussed in the Article. Those persons are all located within this District. Furthermore, persons in Ms. Wilkins' industry and friends are located within this District and can testify as to Ms. Wilkins' damages. Thus, minimally, this factor is neutral.

As to the location of sources of proof, this evidence will be located in Washington, D.C., as well as this District. And "the location of evidence does not "carr[y] much weight in this age of technology." *Finley*, 384 F. Supp. 3d at 904 (quoting *Doe v. Univ. of Tennessee*, No. 3:16-cv-199, 2016 WL 1253004, at *8 (M.D. Tenn. Mar. 29, 2016)). Again, minimally, this factor is neutral.

Finally, the events giving rise to this dispute occurred in this District. And, as Defendants acknowledge, while reserving the right to challenge, Tennessee generally applies the law of the state where the injury occurred, unless some other state has a more significant relationship. Dkt. No. 23.1 at 14 n.10. Here, that injury occurred in Tennessee. Additionally, as the above illustrates, no other state has a more significant relationship to the facts of this case. Accordingly, Tennessee law will apply, making it practical to keep this matter in Tennessee.

In sum, each of the transfer factors either weigh in Ms. Wilkins's favor or are neutral. Defendants are, therefore, unable to meet their *substantial* burden. And

Defendants' reliance on *Sacklow v. Saks Inc.* does not change this conclusion. In *Sacklow*, the court found in favor of transfer because: (1) none of the plaintiffs resided within this District, (2) the defendant provided an affidavit illustrating that important third-party witnesses were located in the transferee district, (3) all of the evidence was located in the transferee district, and (4) the core events giving rise to the dispute largely occurred in the transferee district. 77 F. Supp. 3d at 877–80. By contrast, here, Ms. Wilkins resides within this District, Defendants have provided no affidavit as to third-party witnesses, and, regardless, Ms. Wilkins has illustrated that many key third-party witnesses reside within this District, which also means that key evidence is within this District, and the events giving rise to the dispute occurred within this District. Therefore, Defendants have failed to meet their burden, and their motion should be denied.

## III. Ms. Wilkins has stated a cause of action.

### A. Defamation.

In Tennessee, defamation has three elements: "1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Memorial Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). In this instance, Defendants only challenge the second element: whether the statement is defamatory, and whether it is concerning Ms. Wilkins. The answer to both is yes.

It is standard in defamation cases that "[a] plaintiff may not support a claim for defamation based on an alleged defamatory statement made 'of and concerning' a third party." *Steele v. Ritz*, 2009 WL 4825183, at *3 (Tenn. Ct. App. Dec. 16, 2009) (citing 53 C.J.S. *Libel and Slander; Injurious Falsehood* § 35 (2005)). Here, however, there is no identification problem. The Article repeatedly names Ms. Wilkins, describes her specific conduct, and any reasonable reader would understand the statements as referring to her. This is not a case such as *Aegis Sciences Corp. v. Zelenik*, 2013 WL 175807 (Tenn. Ct. App. 2013), where the plaintiff was a mere passive beneficiary. Instead, Ms. Wilkins is described as the instigator, who was out partying with her friends, and then attempted to misuse FBI resources for her own benefit.

Thus, instead, it appears that what Defendants actually take issue with is whether what they wrote about Ms. Wilkins carries a defamatory meaning. Again, the answer is yes.

"In determining whether a statement is capable of a defamatory meaning, the '[a]llegedly defamatory statements should be judged within the context in which they are made,' and given their usual meaning, 'as a person of ordinary intelligence would understand them in light of the surrounding circumstances.'" *Battle v. A & E Television Networks, LLC*, 837 F. Supp. 2d 767, 771 (M.D. Tenn. 2011) (quoting *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000)). "A trial court is permitted to determine that a statement is not defamatory as a matter of law . . . only when it can say that the statement is not reasonably capable of any defamatory meaning and

cannot be reasonably understood in any defamatory sense." *Battle,* 837 F. Supp. 2d at 774 (quoting *Biltcliffe v. Hailey's Harbor, Inc.*, 2005 WL 2860164 at *4 (Tenn. Ct. App. Oct. 27, 2005)). The challenged statement must be "reasonably [] construable as holding the plaintiff up to public hatred, contempt or ridicule." *Hudik v. Fox News Network, LLC*, 512 F. Supp. 3d 816, 825 (M.D. Tenn. 2021) (quoting *Tidwell v. Holston Methodist Fed. Credit Union*, 2020 WL 3481537, at *4 (Tenn. Ct. App. 2020)).

Defendants contend that "merely suggest[ing] that Wilkins was trying to make sure her friend got home safely" does not amount to "convey[ing] that Wilkins 'abused FBI resources.'" Dkt. No. 23.1 at 18. And that even if some people may view it negatively or as inappropriate, that does not make the statement defamatory. *Id*. at 19. This is a sanitized, context-free restatement of the Article that ignores the very contextual analysis Tennessee law requires.

The Article does not report that Ms. Wilkins merely asked a friend for a favor. The Article says that Ms. Wilkins asked members of an elite FBI tactical unit—SWAT agents pulled from their law enforcement mission to serve as her personal security detail—to abandon their assignment and drive her drunk friend home after a night of partying. It says she did this on multiple occasions. It says the agents objected, and it was only the FBI Director's personal intervention, including yelling at the detail leader, that compelled them to comply. *See* Dkt. No. 23.2. Defendants then framed this conduct in the broader context of a pattern of FBI resource abuse, including comparisons to William Sessions—the only FBI Director in history to be fired, and who was fired specifically for misusing FBI resources for personal benefit. *Id*. And

they quoted a former FBI agent calling the conduct "outrageous" and "demonstrative of Kash Patel's complete lack of judgment and integrity." *Id.*

Viewed in this context, as the law requires, the Article's portrayal of Ms. Wilkins is plainly capable of defamatory meaning. In *Hudik*, the plaintiff was a singer, songwriter. 512 F. Supp. 3d at 820. He worked with fellow musician Daryle Singletary and hired Mr. Singeltary to sing a song that the plaintiff was writing, while the plaintiff owned the rights to the song. *Id.* at 821. When Mr. Singletary unexpectedly passed away, the plaintiff publicized the song for the first time, with a link for donations to the Singletary family. *Id.* The Singletary family publicly took issue with this, stating this was unapproved. *Id.* at 821–22. The defendant then published an article with the title, "Daryle Singletary's new single is a scam, not benefiting his widow and kids, business partner says." *Id.* at 822. The plaintiff then brought suit for defamation. The defendant argued that merely calling a song a "scam" could not convey a defamatory meaning. *Id.* at 833.

This Court held that the word "scam" in a headline could subject the plaintiff to "public hatred, contempt or ridicule" because of "the connotations of the word 'scam'" and the public's hatred for one involving "the misuse of a recording of a recently deceased person and collecting donations purportedly on behalf of a grieving family." *Id.* at 834. This Court concluded: "Simply put, the Court cannot conclude as a matter of law at the motion-to-dismiss stage that this headline does not hold Plaintiff up to hatred, contempt, or ridicule." *Id.* The same principle applies here.

If calling a plaintiff's release of an unheard song—by a recently deceased musician—a "scam" is capable of defamatory meaning, then accusing a private citizen of misusing federal SWAT agents as personal chauffeurs for her drunk friends—in an article that compares this conduct to the behavior that got William Sessions fired—is a likewise capable of defamatory meaning. No reasonable reader would view the Article and think: "Ms. Wilkins was just trying to help her friend get home safely." Instead, a reasonable reader would think: "Ms. Wilkins used her relationship with the FBI Director to commandeer federal law enforcement agents as her personal car service, diverting taxpayer-funded SWAT resources for her own convenience." That carries precisely the "element of disgrace" that *Hudik* requires. *Id*. at 825.

Defendants attempt to minimize the Article's sting by drawing a distinction between "asking" and "demanding." Dkt. No. 23.1 at 17. They note that the Article says Ms. Wilkins "asked" and "requested"—not "demanded"—as though this makes her conduct sound reasonable. But the gravamen of the defamatory charge is not the verb Defendants chose. It is the nature of the conduct itself: using a personal relationship with the FBI Director to divert federal agents from their duties for her personal convenience. Whether one "asks" or "demands" that SWAT agents chauffeur a drunk friend home, the conduct is equally disgraceful in the eyes of the public. And even if a hypothetical person could find that this statement is not defamatory, it is of no consequence. Dismissal is only appropriate when a court "can say that the statement is not reasonably capable of *any* defamatory meaning and cannot be

reasonably understood in *any* defamatory sense." *Battle*, 837 F. Supp. 2d at 774 (quoting *Biltcliffe*, 2005 WL 2860164 at *4) (emphasis added). Here, as illustrated, Defendants' Article is reasonably viewed as defamatory.

**B. False light invasion of privacy.**

As Defendants note, for a false light claim, "the court's job is to determine if [1] the identified statements are capable of portraying the plaintiff in a false light [2] that is highly offensive to a reasonable person." Dkt. No. 23.1 at 19 (quoting *Schuchardt v. Bloomberg L.P.*, No. 3:22-cv-1017, 2024 WL 1144226, at *14 (M.D. Tenn. Mar. 15, 2024)). "Tennessee recognizes the claim of false light invasion of privacy as a cause of action separate and distinct from defamation, to protect the rights of plaintiffs who 'have had attributed to them certain qualities, characteristics, or beliefs that, while not injurious to their reputation, place those persons in an undesirable light.'" *S.E. v. Chmerkovskiy*, 221 F. Supp. 3d 980, 985 (M.D. Tenn. 2016) (citing *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001); *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38 (Tenn. Ct. App. 2013)). Defendants argue that the Article does not portray Wilkins in a false light and, alternatively, that even if it does, the portrayal is not "highly offensive to a reasonable person." Both arguments fail.

Defendants contend that the Article does not imply that Ms. Wilkins was inebriated because it describes only her friend as "allegedly inebriated" but nothing her own alcohol consumption. Dkt. Nol 23.1 at 20. This is a strained and implausible reading. The Article opens by reporting that "FBI Director Kash Patel has—on more

than one occasion—ordered that the security detail protecting his girlfriend escort one of her allegedly inebriated friends home after a night of partying in Nashville." Dkt. No. 23.2. It then reports that "Patel's girlfriend, Alexis Wilkins, asked FBI agents on her security team at least two times, including once this spring, to drive her friend home." *Id*. The implication is, therefore, clear: Ms. Wilkins was present during these "night[s] of partying." She was there with her friend. She was the one who asked the agents to act. The Article does not need to spell out that Ms. Wilkins was also partying and drinking—the framing of the Article communicates it. Indeed, Defendants' own reporter recognized the implication, telling the FBI spokesperson, "just to be clear no one is saying Alexis was drunk." Compl. ¶ 43. That defensive clarification proves Defendants knew their Article carried exactly the implication they now deny. Yet they included no similar clarification for their readers. Tennessee law is clear that "for a false light claim, the defendant need not have made a literally false statement; rather, it is sufficient that the defendant's statement either implies underlying facts that are false or that the overall context of the statement leads to inferences that cast the plaintiff in a false light." *Chmerkovskiy*, 221 F. Supp. 3d at 985 (emphasis in original).

The *Chmerkovskiy* case is illustrative. There, a celebrity posted a photograph of a child with Down Syndrome drinking what appeared to be a sugary beverage alongside a statement that "letting a child become overweight by not controlling her consumption is *akin* to child abuse." 221 F. Supp. 3d at 986 (emphasis in original). The defendant's opinion was not itself a provably false statement of fact. But the court

held that "by posting the photograph of S.E. drinking what appears to be a sugary beverage alongside this statement, the posting may create an inference of an underlying fact that S.E. has been given unhealthy dietary guidance by her family and is overweight as a result." *Id*. A similar principle applies here. The Article's statements—that Ms. Wilkins' friend was "allegedly inebriated" after "a night of partying"—are not explicit accusations that Ms. Wilkins is a habitual heavy drinker and partier. But by placing her at the center of the narrative, identifying her as the person who made the request, and describing the scene as a "night of partying in Nashville," the Article creates an inference that Ms. Wilkins is, in fact, a habitual heavy drinker and partier.

Defendants argue that even if the Article implies Wilkins was drinking, this would not be "highly offensive to a reasonable person" because "[a]lcohol consumption, standing alone, is neither illegal nor stigmatized in the community." Defs.' Br. at 22 (citing *State v. Itzol-Deleon*, 2016 WL 1192806, at *26 (Tenn. Crim. App. 2016)). This argument mischaracterizes the false light at issue. The Article does not merely suggest Wilkins consumed alcohol on one or two occasions. The Article's framing portrays her as "a heavy drinker, who regularly parties late at night in Nashville, Tennessee." Compl. ¶ 42. That is the false light. Not a glass of wine at dinner, but a fabricated portrait of a woman whose lifestyle revolves around late-night partying and heavy drinking in Nashville. That false portrait is devastating to a woman whose professional identity, as the Complaint alleges, "is of a responsible, sober young woman who does not partake in the excess drinking culture and party

scene that is typical for musicians." *Id.* ¶ 45. *Itzol-Deleon* is inapposite. It was a criminal evidentiary ruling about whether mentioning alcohol consumption in trial testimony was prejudicial to a defendant. 2016 WL 1192806, at *26. It has nothing to do with whether falsely portraying a self-described sober woman as a habitual heavy drinker in a national news article is "highly offensive." While Defendants argue that Ms. Wilkins's "own public profile illustrates that being associated with alcohol is not highly offensive," this is outside the four corners of the Complaint and not entitled any weight at this stage in the proceedings.

Defendants' other cases fare no better. For example, in *Harris v. Gaylord Entertainment Co.*, the court held that telling a journalist, "we're only taking questions from invited journalists"—thereby implying she was not invited to an event—was not highly offensive. 2013 WL 6762372, at *7 (Tenn. Ct. App. 2013). The court reasoned that the statement "does not affect Ms. Harris's reputation as a country-music historian, ethnomusicologist, media personality, or journalist." *Id.* Here, by contrast, falsely portraying Wilkins as a heavy drinker who regularly parties late at night directly undermines the professional identity on which her career depends. Compl. ¶ 45. It is the kind of "major misrepresentation of [her] character, history, activities or beliefs that serious offense may reasonably be expected." *Harris*, 2013 WL 6762372, at *6 (quoting RESTATEMENT (SECOND) OF TORTS § 652E cmt. c (1977)).

In the Oregon Court of Appeals, the court addressed allegations of alcoholism in *Dean v. Guard Pub. Co., Inc.*, 88 Or. App. 192 (1987). There, the plaintiff was

already widely known as an alcoholic, however, the defendant falsely implied that the plaintiff was hospitalized and undergoing aversion therapy for his condition. *Id.* at 195. The trial court held that "given the fact that plaintiff is an alcoholic, the public perception of him could not be worsened—and he could not reasonably be highly offended—by the further implication that he was a patient at the alcohol treatment facility." *Id.* at 196. The Court of Appeals reversed, holding, "[w]e do not agree that the circumstances in which an alcoholic is portrayed *cannot* affect how he and his condition are perceived, over and above the perception that he is an alcoholic." *Id.* (emphasis in original). Specifically, "a jury could find that being portrayed as an alcoholic who is in need of inpatient aversion treatment can reasonably be regarded as more offensive to the person portrayed and as denoting a more serious condition to those who perceive him than would his being portrayed as an alcoholic, without more." *Id.* Similarly, here, implying that someone is a habitual drinker and partier, in a party town such as Nashville, as opposed to someone who may have an occasional alcoholic drink, denotes a more serious accusation that a jury could find reasonably offensive. Accordingly, minimally, this is a question for the jury.

## CONCLUSION

For the foregoing reasons, Plaintiff, Alexis Wilkins, respectfully requests that this Court deny Defendants' Motion to Dismiss or Transfer in its entirety.

Dated: August 25, 2026

ALEXIS WILKINS
By Counsel

Respectfully submitted,

/s/ Jason C. Greaves
Jason C. Greaves (as *pro hac vice*)
Jared R. Roberts (as *pro hac vice*)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
jason@binnall.com
jared@binnall.com

Kurt V. Beasley
WATERFORD LAW GROUP, PLLC
P.O. Box 1089
Franklin, Tennessee 37065
Phone: (615) 373-2500
kbeasley@waterfordlaw.com

*Counsel for Plaintiff Alexis Wilkins*

## CERTIFICATE OF SERVICE

I certify that on August 25, 2026, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Jason C. Greaves
Jason C. Greaves

*Counsel for Plaintiff Alexis Wilkins*